*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 22, 2020

Plaintiff-Appellee,

v

No. 345699
Ingham Circuit Court
LC No. 17-000526-FC

LAWRENCE GERARD NASSAR,

Defendant-Appellant.

Before: CAMERON, P.J., and SHAPIRO and GADOLA, JJ.

SHAPIRO, J. (*dissenting*).

This case is an example of bad facts making bad law. The facts are very bad; defendant is guilty of sexual crimes against over 150 women and girls which he accomplished by abusing a position of profound trust. The sentence he received was not disproportionate nor outside the range defined by his plea agreement. I therefore sympathize with the majority's wish to overlook the trial court's errors. However, doing so makes bad law. The process by which this sentence was imposed challenges basic notions of judicial neutrality, due process, the right to counsel, and the use of social media by judges. The errors at sentencing were neither minor nor isolated and by approving of them, even if reticently, the majority invites further distortions of sentencing procedures. Accordingly, I respectfully dissent.

I.

Defendant pleaded guilty to seven counts of first-degree criminal sexual conduct in exchange for (1) dismissal of multiple other counts of criminal sexual conduct, (2) the prosecution's agreement not to file charges concerning over 100 other allegations of criminal sexual conduct against defendant and (3) imposition of a minimum term of at least 25 years but no more than 40. In his plea, defendant admitted that he used his position as a doctor to repeatedly commit acts of criminal sexual conduct in the first-degree against scores of women and girls who came to him for medical care. This case was, and remains, notorious for several reasons: the appalling nature of defendant's actions; the number of women and girls that he assaulted; his misuse of the trust that came with his position as a physician; and the fact that many of his victims were world-class athletes.

Defendant's sentencing procedure was unique. Under the Crime Victim's Rights Act, MCL 780.751 *et seq.*, the victims of the crimes for which the defendant was convicted (and in some cases their family members) may address the court before sentence is imposed. Thus, under normal circumstances the number of victim impact statements would have been limited by defendant's guilty plea. However, as part of his plea agreement, defendant agreed to waive any limitations on the number of victims that would be allowed to speak. The victims' statements continued for eight days with over 150 speakers.[1] After each speaker, the sentencing judge made comments praising and expressing personal solidarity with the victims and, in many instances, denouncing the defendant.

After sentencing, defendant filed a motion for resentencing or correction of an invalid sentence and a motion for disqualification on the same day.[2] The sentencing judge denied the motion for disqualification, which was then referred to the chief circuit judge, who also denied the motion on de novo review and a subsequent motion for reconsideration. The sentencing judge then held a hearing on defendant's motion for resentencing. She denied the motion for resentencing but issued an amended judgment of sentence removing any reference to defendant's federal sentences. We granted defendant's delayed application for leave with respect to his arguments for resentencing before a different judge. See *People v Nassar*, unpublished order of the Court of Appeals, entered December 13, 2018 (Docket Nos. 345699 and 345808).

II.

---

[1] Some of the oral impact statements were given by family members of the victims who are not authorized to do so if the victim herself can do so. MCL 780.765(1) provides, "The victim has a right to appear and make an oral impact statement at the sentencing" and goes on to state that "[i]f the victim is physically or emotionally unable to make the oral impact statement, the victim may designate any other person over 18 . . . to make the statement on his or her behalf." Consistent with the statute, the plea agreement provided that defendant "agrees to allow all victims *or* their parent/representative to give victim impact statements at Defendant's sentencing hearing." (Emphasis added).

[2] I disagree with the majority that plaintiff's motion for disqualification was untimely. MCR 2.003(D)(1)(a) provides, "To avoid delaying trial and inconveniencing the witnesses, all motions for disqualification must be filed within 14 days of the discovery of the grounds for disqualification." Defendant's motion for disqualification did not seek to disqualify a judge from trial but rather sought to preclude the sentencing judge from presiding over the motion for resentencing and any subsequent proceedings. As the two motions were filed together, the question of disqualification as to the resentencing motion was clearly timely and the events that occurred after sentencing are all relevant. At the very least, there was "good cause" for defendant filing the motion when he did. See MCR 2.003(D)(1)(d). Further, the timeliness of a motion for disqualification is only a factor to be considered in deciding whether the motion should be granted. MCR 2.003(D)(1)(d). I also conclude that the motion for resentencing was timely because it was brought within six months of entry of the judgment of conviction and sentence. See MCR 6.429(B)(3)(b).

Defendant asserts that he is entitled to be resentenced before a different judge on the ground that the sentencing judge was biased against him. The Supreme Court has made clear that: a finding of judicial bias is not subject to a harmless-error test; review of a disqualification motion requires an appellate court to consider the totality of circumstances; and certain factors are relevant in determining if a judge's statements and actions "pierced the veil of judicial impartiality":

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review. Rather, the judgment must be reversed and the case remanded for a new trial. [*People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015).]

Pursuant to MCR 2.003(C)(1), a judge may be disqualified if she is biased or if her statements or conduct objectively create an appearance of bias inconsistent with Canon 2 of Michigan's Code of Judicial Conduct:

> Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:
>
> (a) The judge is biased or prejudiced for or against a party or attorney.
>
> (b) The judge, based on objective and reasonable perceptions, has either (*i*) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (*ii*) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

Canon 2 of the Code of Judicial Conduct states in relevant part:

> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
>
> B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect. [Code of Judicial Conduct, Canon 2(A) and (B).]

The judge's statements at issue were made during sentencing. Contrary to the prosecution's argument on appeal, the responsibility of a judge to render decisions impartially does not end with a guilty verdict or plea. Due process entitles a defendant to impartial and disinterested decisionmaker, *Stevens*, 498 Mich at 179 n 5, and "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause," *Gardner v Florida*, 430 US 349, 358; 97 S Ct 1197; 51 L Ed 2d 393 (1977) (plurality opinion). The facts that come to light during a trial or sentencing may be grounds for a fair and impartial judge to impose a harsh sentence, but even when doing so, it is the judge's responsibility to maintain judicial neutrality, and determine a proper sentence on the basis of the defendant's crimes and character rather than the judge's personal anger, or the extent of revenge sought by the defendant's victims.[3] A guilty verdict terminates the presumption of innocence but it does not terminate a judge's responsibility to exercise her judicial responsibilities consistent with the law and the Code of Judicial Conduct. See e.g., *In re Moore*, 464 Mich 98, 102, 106, 110; 626 NW2d 374 (2001). "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Liteky v United States*, 510 US 540, 551; 114 S Ct 1147; 127 L Ed 2d 474 (1994). Such a stringent rule may sometimes bar judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, "justice must satisfy the appearance of justice." *Offutt v United States*, 348 US 11, 14; 75 S Ct 11; 99 L Ed 11 (1954).

It is not necessary to recount all of the statements indicating the court's bias against defendant but I offer some examples. Over the course of the eight-day sentencing, the judge repeatedly referred to defendant as a "monster" who is going to "wither away" and "disintegrate" in prison, and stated that he "will be spending the rest of his life behind bars," "trapped in a small cell with bars" during which time the "[l]ife will be sucked out of him," and he will be "crushed." The judge refused to use defendant's name during sentencing, stating, "[H]e doesn't deserve to be called by his first name or his former title. I hate even using his last name now after hearing from all of you. He is defendant to me."[4] The judge also praised the victims' denunciations of defendant. The victims' denunciations were not improper, but it is improper for the court to thereafter make statements such as "you kicked him down with your words, did an awesome job with that."

The judge also expressed a wish that defendant be subjected to repeated sexual assaults as punishment for his crimes, stating, "Our constitution does not allow for cruel and unusual punishment. If it did, I have to say I might allow what he did to all of those beautiful souls, these young women in their childhood, I would allow someone or many people to do to him what he did to others." She noted personal satisfaction in imposing sentence, stating, "[I]t is my honor and

---

[3] The United States Supreme Court has held that it is unconstitutional in death penalty cases for the court to admit sentence recommendations from the victim's family. *Bosse v Oklahoma*, ___ US ___; 137 S Ct 1; 196 L Ed 2d 1 (2016). Whether sentence recommendations from victims in non-death penalty cases are similarly infirm remains an open question.

[4] Several of the victims, with permission from the court, also denounced other individuals employed by Michigan State University.

privilege to sentence you." And referring to the 175-year maximum sentence, the judge told the defendant, "I've just signed your death warrant."

The judge further displayed bias during the sentencing in response to an objection by defense counsel. During her statement to the court, one of the victims denounced defense counsel for being willing to represent defendant. Counsel objected, but the court stated that the comment denouncing counsel was proper. And at the post-sentencing motion for disqualification, the court stated that defense counsel's objection was improper because it occurred during a victim's statement despite the fact that no such rule of law exists. The court then stated that defense counsel "is lucky I did not hold them in contempt for interrupting a victim of sexual assault," a statement that defies the right to counsel and due process. Counsel's objection was proper. The court's rejection of it was not in and of itself indicative of bias, but the court's later statement that the objection was improper regardless of its merits and that the making of the objection would justify holding the attorney in contempt is demonstrative of bias and has a chilling effect on all attorneys who may seek to raise a proper objection during a sentencing proceeding.

Finally, we should not overlook the sentencing judge's frequent references to extrajudicial matters that did not directly concern defendant or his crimes. Throughout the sentencing hearing, the judge repeatedly called for social and legal changes to address the failure of the Legislature, public institutions, the courts and society as a whole to adequately deal with the scourge of sexual assaults and the silence that contributes to their continuation. The judge permitted, if not encouraged, many of the speakers to discuss not only the impact of defendant's crimes upon themselves, but also to call for investigation and punishment of others and for social change. I do not doubt that much of the judge's comments about the failure of responsible adults and institutions to have protected these women and girls and her calls for legal and social change are deserving of further discussion as well as action in state government and society as a whole. However, in the context of a court imposing a sentence on a single guilty individual, the judge's repeated demands for legal and social change created a high likelihood that the sentence imposed was calculated to serve purposes other than imposing a proper sentence on defendant. A review of the sentencing transcripts makes clear that the sentencing judge is an articulate and effective advocate; however, the role of a judge at sentencing is not that of an advocate.

I also understand that to some degree the judge's intent in denigrating defendant was to provide support and healing to the victims by explaining to the victims that defendant would grow weaker while they would grow stronger as they recovered from his crimes. And I take no issue with a sentencing judge offering solace and support to crime victims. However, when statements of solidarity with the victims are repeated many, many times and intermingled with repeated denunciations of the defendant and predictions of the suffering he will endure as a result of his conviction and sentence, it changes the character of the proceeding. When announcing a sentence, the judge may make an isolated statement harshly denouncing the defendant without it rising to the level of bias or even the appearance of bias. See *People v Antoine*, 194 Mich App 189, 191; 486 NW22d 92 (1992). However, when the judge repeatedly disparages the defendant over an eight-day period, it demonstrates bias or at least gives the appearance of it.

The judge's post-sentencing conduct further shows an appearance of impropriety. At the conclusion of sentencing, the judge stated that she would not be making public comments

concerning the case until after defendant's appeals were completed, which was required by Canon 3 of the Code of Judicial Conduct: "A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court." Code of Judicial Conduct, Canon 3(A)(6). Nevertheless, the judge made several statements on social media that are disturbing, including praise for a cartoon that showed defendant as a rat being dropped into a garbage disposal by the judge.[5] Perhaps most troubling was the judge's approval of a comment made on her Facebook page. The judge had posted a news article on her page titled, "Judge['s] . . . sentencing of Larry Nassar was within her judicial rights." And in response to a comment stating, "I don't give a shit if it was or wasn't. Fuck him [i.e., defendant]," the judge posted a laughing emoji.[6] This statement was made before defendant filed, and the judge later denied, the post-sentencing motions, and thus plainly violated Canon 3(A)(6). Moreover, during sentencing, the judge noted her own attention to extrajudicial social media comments concerning the case: "I read some of the Twitters and Facebooks and all of what's going on in the media." As with all social relationships and contacts, "a judge must comply with relevant provisions of the Code of Judicial Conduct and avoid any conduct that would undermine the judge's independence, integrity, or impartiality, or create an appearance of impropriety" when participating in social media. American Bar Association, Formal Opinion 462: Judge's Use of Electronic Social Networking Media (February 21, 2013).

Judges are not robots and we should not reverse on a claim of bias because of an isolated intemperate comment or the court's blunt condemnation of the defendant's crimes as abhorrent and notorious. However, when such comments are repeated on multiple occasions in the course of the sentencing and then followed post-sentencing by inappropriate remarks reinforcing the appearance of impropriety, resentencing before a different judge is required.

/s/ Douglas B. Shapiro

---

[5] The majority declines to consider the cartoon because it was not part of the lower court record. I note that the judge's comment to the cartoon is dated December 11. Because defendant was sentenced in January 2018, it is safe to say that the comment was made on December 11, 2018, i.e., after the lower court rulings that defendant appeals. Under these circumstances, I would exercise our discretion to consider the document under MCR 7.216(A)(4), which "permit[s] . . . additions to the . . . record[.]"

[6] The majority relies on the judge's explanation that she intended to use the laughing emoji in response to another comment. Even assuming that the judge responded to the post by accident, MCR 2.003 provides for disqualification for the *appearance* of impropriety.